The case this afternoon, number 07-2539, American Civil Liberties Union et al. v. Mukasey. Mr. Scarborough and Mr. Hanson. May it please the Court. My name is Charles Scarborough with the Department of Justice for the Attorney General. I would like to reserve, if the Court would allow, five minutes for rebuttal. That's fine. You've been living this case for a long time, haven't you? Yes, Your Honor. This was the second case that was introduced to me upon my arrival at the Department of Justice. Is this one of those things where you just say, thank you very little? Well, it's an interesting case, Your Honor. But it seems like you go back to the creation of this. I don't want to take credit for the creation of this. I've certainly been involved in it. Your Honor, there's no doubt that the government has a compelling interest in protecting children from the harmful effects of pornography and other sexually explicit material on the World Wide Web. Could you start, just so we can get it out of the way, the issue of whether the prior decision of our Court in 2004 is, in effect, the law of the case? Well, as you know from our submission, we believe that it is not. It is not binding in any respect. And that's primarily because the Supreme Court, when it sent the case back, remanded for a full consideration of COPA's relative efficacy and restrictiveness as compared to filtering and sort of implicit in that analysis a balancing of the two alternatives. Didn't the Supreme Court just send it back on a fairly narrow ground? And didn't it explicitly say we're not going to deal with the rest of the Third Circuit opinion? You're right, Judge Chigars. It went out of its way not to endorse anything in the prior panel. Well, or refute it. I understand. It did not vacate it. But when it remanded, implicit in the analysis of sort of determining whether COPA is less restrictive or more effective than filtering is a full examination of sort of what COPA covers. You can't sort of do the filtering part of it in isolation. You have to reexamine what does COPA cover. You have to consider it issue by issue. In other words, sometimes, for example, the law of the case, if it was a mistrial, ordinarily wouldn't apply on the admission of evidence because the evidence, you know, you make a ruling on evidence and you have to know the context of the trial at that point. But if certain legal issues are determined that in a sense are independent of the record or are of legal nature, why wouldn't the law of the case apply there? Now, I know if it's dependent upon the record, that's a different story. Well, Your Honor, in our view, I mean, this case is in many respects dependent upon the record. And the Supreme Court remanded for, you know, renewed consideration of COPA's burdens as compared to filtering's burdens and efficacy. And implicit in assessing burdens is figuring out how much speech does the statute regulate. So in our view, really the two are sort of inextricably intertwined, if you will. And I would also say that, you know, this Court's decision in Pitt News also gives the Court, you know, a lot of leeway to reexamine a prior panel's conclusions. In Pitt News, in the first panel decision, the Court made a legal determination that the burdens on Pitt News were irrelevant for First Amendment purposes. And the second panel, Judge Alito writing for the Court, you know, squarely disagreed with what is essentially a legal ruling there. And in part he did that because the prior panel's ruling was ultimately, even though there were sort of legal conclusions involved, ultimately they were all to buttress a finding that there has been no demonstration of a likelihood of success on the merits. And that's the key issue here is that really while there are sort of determinations in the prior panel rulings in this case that could be viewed as legal conclusions, they ultimately go to a final conclusion, a holding, if you will, that there has been no abuse of discretion in entering the preliminary injunction. And in those circumstances, a second panel is free.  I mean, then-Judge Alito stated in Pitt News, had the prior panel gone further and taken an unequivocal position on the merits, we'd consider ourselves bound under our tradition and likewise. You don't have to really look it up, but didn't we go to the merits? No, Your Honor. I mean, and what I was actually reaching for was our letter in which we set out how ultimately the Court did make, as Judge Greenberg said, some conclusions of law, but ultimately all those conclusions of law were just to sustain a conclusion that plaintiffs have demonstrated a likelihood of success on the merits. So it is really the same as Pitt News, and we submit that it's an a fortiori case for, you know, a renewed consideration because unlike in Pitt News, this case has now been up to the Supreme Court. The Supreme Court sent it down, and we think it would be in some respects foolish and a little bit of a waste of judicial resources for this panel not to look at all the issues afresh. And certainly, I want to remind the Court, law of the case is a discretionary doctrine. Going forward then, if the Supreme Court ruled on whether there were less restrictive alternatives in terms of likelihood of success, and a majority of the Court found that there were less restrictive alternatives and sent it back for further development. And when I look at what Judge Reed did here, I'm not sure anyone, I can't conceive of any judge being more comprehensive in terms of the facts that were found. Doesn't that pretty much make this a, you're marching up San Juan Hill, as Judge Becker used to say. With respect, Your Honor, the judge made a lot of factual findings, and the question here is the legal effect to be given to those factual findings. You know, we're not here challenging. Well, if the Supreme Court sent it back, if you're not challenging the factual findings, and the factual findings show that indeed there, on every issue, there were findings, but just take, for example, less restrictive alternatives, the filters, for example. What is there left for us to try, even if we were inclined to go your way, because obviously there's no doubt Congress has passed a law here with an extremely good intention in mind. The question is, does it run afoul of the First Amendment? That's correct, Your Honor. And I don't know what's left if you're not challenging those findings of fact. Well, I mean, I want to make sure, be clear, we're not challenging when the, you know, we're not going to quarrel about percentages between, you know, a 95 percent efficacy rate in filtering versus, you know, 90 percent efficacy rate, which our study showed on some of the things. That's the type of factual finding that we're not going to fight with, even though we think, you know, the district courts, a lot of the district court's findings are wrong in some respect. What we're challenging is the legal conclusion to be drawn from that. Even if you assume that there's a 95 percent efficacy rate for filtering, there still remains a significant child protection problem, and the question is whether the First Amendment disables Congress from acting to attack the problem, a serious and growing problem at its source, or whether it, you know, somehow requires Congress to rely on the voluntary implementation of filters by parents. And what the record conclusively demonstrates here, and what the district court made no finding on, is that 50 percent, approximately 50 percent of all parents, still are not using filtering. And that's even given the fact that by the district court's own findings, they are relatively easy to use, relatively easy to install, available cheaply, so on and so forth. And the question that the Supreme Court remanded for, in our view, is whether given sort of the existing state of the world with filters, which have definitely improved over time, there's no question they've improved within the last 10 years, whether there's still a child protection problem, and whether filters or COPA, more encouragement of filters or COPA's age verification mechanism is a reasonable way to approach the matter. How do the filters work? Very roughly speaking, most filters, as I understand it, are dynamic. They look for search terms and things like that, and they try to screen out terms that are associated with, you know, harmful to minors, obscene, other types of speech of that nature. And they do so. As I understand it, there are ways to get at the picture component as well. Certainly they do pull out a lot of the picture, a lot of the images as well. But they miss a lot of stuff, and in particular, you know, I don't want to offend the court, but we've submitted at JA 880 to 920 40 pages of material that is clearly harmful to minors. It is clearly pornography. It is clearly for a commercial purpose, and it is missed by three to four filters. There still is a child protection problem. I will say this is not your average record. That's correct. And in prior iterations, Your Honor, we submitted the porn in color. We've refrained from that this time. But the point is, in a more serious vein, it is... I always used to skip it, but I had a clerk a number of years ago go, I'll look at it, Judge. I got you covered. It's certainly a plum draw for a clerk. The point is that there is a significant child protection problem. Even if you assume a 95% efficacy rate, there is still a lot of pornography getting through. And what you need then to do is look at, well, should Congress just have to encourage more filtering? Should Congress just have to try to bulk up that 50% number of parents who are not using filtering? Or can it take some reasonable age verification effort, impose that on the people at the source? And what we submit is that COPA is nothing more than a blinder rack display law applied to the Internet. And certainly the constitutional analysis in those cases has always been on the side of blinder racks are okay. They impose some burdens on adults who want to get to the harmful to minors material, but they're not impermissible burdens. The Crawford case out of the Ninth Circuit that dealt with the giving of the ban on the display of harmful to minors materials in sidewalk vending machines is illustrative of that. There was no question that that burdened the people who sought to get their harmful to minors material out to the public. It was not an impermissible burden. I think what Mr. Hansen may say is that, look, nothing's perfect. But if nothing's perfect, why not go with the least restrictive abridgment of rights under the First Amendment, i.e. the filters? I'm sure that's what he'll say. And what we would say and what Congress has consistently said is there is nothing impermissible about a belt and suspenders approach. COPA, keep in mind, encourages filtering, promotes filtering in many ways. The COPA commission report was something that resulted from the statute itself. COPA requires in Section 230D ISP providers to give information about filtering. There is no question that filtering is out there. People know about filtering, and yet 50 percent of parents still aren't using it. The question then becomes if there is still a child protection problem, can Congress impose some sort of reasonable age verification measure? But I keep coming back. If the Supreme Court, having looked at our last decision, said that we agree and we affirm that there is an injunction should stay in place because there is a likelihood of success with regard to those challenging COPA, how do I get around that? Well, again, Your Honor, the Supreme Court's reasoning has to be... Absolutely, Your Honor, and the Supreme Court's assessment of COPA was on the preliminary injunction stage. They were reviewing the assessment made by the district court. But then that's why I said to you the facts are, I mean, if this were an assignment to somebody to do it, I just don't know how you could do it any more comprehensively than what Judge Reed did here. With respect, Your Honor, I mean, Judge Reed sort of ignored some significant portions of the problem, including the 50 percent non-use of filters by parents. But are you arguing that anything that he's done is clearly erroneous? We're arguing that the inferences that you draw about whether COPA impermissibly burdens protected speech, that they were wrong based on this factual record. And in particular, I hate to keep harping on it, the 50 percent non-use of filters. That means that there is a significant gap here, and the question is whether Congress can address the gap with the age verification measure. And to flip to that, they would say is that 50 percent of the sites are foreign sites, and it's actually growing. It's probably more than 50 percent now. Again, Your Honor, I'm not here to say that COPA's perfect. Our point is that filters are not perfect as well, and that's why I refer to the belt and suspenders approach. If there's one thing that the studies, the National Resources Council report, which is a very, it's actually a book, and a lot of it's submitted in the voluminous joint appendix there, and the COPA Commission report agree on is that there is... It's the part without pictures. Yes, it's the more boring actual reading that you have to do. If there's one thing that you can glean from those reports is that there is no one problem, I mean one solution to solve this problem here, that a multifaceted approach is necessary. And the question is whether the component that is age verification, that is essentially blind direct laws as applied to the Internet, somehow imposes a First Amendment burden. And in our view, that requires an assessment of what does COPA actually cover. And in that respect, the district court made a lot of serious, serious errors. It really violated the cardinal rule of statutory construction to construe a statute to save it, rather than to exacerbate the constitutional problems. The problem here is the district court sort of stretched COPA to cover every conceivable case at the very margins and focused on the margins as opposed to the heartland that the statute is clearly intended to regulate, that the district court found the statute was intended to regulate commercial pornography. The most egregious sort of error in the statutory construction in our view is the district court said explicitly the commercial purposes exception is a near nullity. That just cannot be right. The commercial purposes provision clearly limits COPA to those engaged in the business of knowingly posting. They argue among other things in terms of narrow tailoring. They argue that there is over-inclusivity. Maybe you could address the, and they're specifically going on the commercial purpose and engaged in the business. If you could address those, why those aren't over-inclusive. Again, Your Honor, we think that they limit the statute appropriately to those who regularly in the course of their business on the internet post harmful to minors material on the net. The fact that it doesn't say commercial pornographers is of no moment. As a practical matter, that definition focuses in on commercial pornographers. The fact that it may at the margins sweep in somebody else who might provide content for free, but have advertising, seek to make a profit from the posting of harmful to minors materials. You can't assess the burdens solely as to the margins. If there's one thing that the Supreme Court's decision in Williams recently makes clear, is you need to look at the heartland. You can't focus entirely on the fanciful hypotheticals at the margins in assessing facial overgrowth. One of the key factual findings that the district court made, I can think of about four here, a news magazine like Salon.com or a girls' sex education website like Scarletteen.com would technically, which has sexually explicit material, isn't what's supposed to be covered by this act, and yet it seems that it would be covered by this act. Your Honor, again, we're not suggesting that there aren't applications of COPA that could be problematic. We're looking at a facial overbreath challenge where the question is whether the burdens in relation to the plainly legitimate sweep of the statute, i.e. the application to the commercial pornographers who already use credit card verification, already accept these various forms of identification, the burdens clearly aren't impermissible as to those guys. That's the vast majority of what COPA covers, and the fact that there may be an impermissible application at the margins, i.e. to Salon, perhaps, that's something for an as-applied challenge. And keep in mind, Your Honor, I alluded to the fact that this case has been in litigation forever, almost a decade at this point. These are kinks that would have been worked out over the course of time in the enforcement in as-applied challenges, presumably. And presumably you might never get to an as-applied challenge if you don't have a prosecutor who goes after someone like Salon. Clearly the statute is focused on the commercial pornography industry, and that is a permissible application. I mean, this Court and the Supreme Court have really said, you know, in the Pitt News case and in other cases as well, that when you're looking at burdens, that's something you normally do in an as-applied challenge. And here you have speculation about what COPA might conceivably be applied to, and then a determination that, well, that's just too burdensome. What about the finding that the age verification processes will deter Internet users because of privacy and identity theft considerations? Well, again, that's, you know, when you think of a factual finding, you think of something that's a little bit harder than that. I mean, that's sort of a qualitative notion that there is going to be a deterrent. And I believe what Your Honor is referring to is that, you know, users are going to be unwilling to provide credit cards or personal information if they have any alternative. That's at J31. And I think that's a very important point because if COPA were in effect, they wouldn't have any alternative. If they wanted this stuff, they would have to provide that information. So the effects on traffic are really entirely speculative. And once again, it goes back to my original point. It's why these sorts of burdens should be assessed on an as-applied challenge, not on a facial over-breath challenge because we're necessarily speculating about a lot of things here. But again, that's a finding of fact on pages 806 and 807 of the Court's opinion. What about the cost? But Your Honor, I don't mean to interrupt. Go ahead. I mean, again, it's a very qualitative finding of fact. It's mushy. And the question is, well, what sort of First Amendment conclusion do you draw from that? Does that mean it's impermissibly burdensome? I mean, in Crawford, in the Ninth Circuit case, there was no question there was burden on the people who wanted to distribute their material through the sidewalk vending machines. They lost money. They couldn't get their material out there. There's no question there was burden. We've never come in here and said COPA is an entirely cost-free statute. But the question is whether the costs are out of proportion, as Justice Breyer would say in his opinion when he dealt with this, whether it's out of proportion to the benefits, to the extra benefits that you are getting in addressing a serious and escalating child protection problem. Let me ask you a very practical question. If we disagree with you and law of the case applies, plus the factual findings, which apparently are not being challenged, do you have a chance of prevailing here? Well, again, the factual findings, I mean, they are what they are, but there are some significant factual findings that are left out, such as the 50 percent non-use of filtering. That's a critical factual finding. There's nothing from the district court on that. There's no assessment of sort of what the reasons for that are or anything else like that. And that's really, it's a significant thing, and it's undisputed. Where is the finding of fact that there's 50 percent non-use of filters? It's unchallenged. The plaintiff's expert conceded 54 percent non-use of filters. It's JA 159. And, you know, again, we can quibble at the margins. We have some surveys that say, you know, there's only about 40 percent of parents using it. We're not quibbling at the margins. And previously, even if that were a finding of fact, when you get into the under-exclusivity or under-inclusivity, excuse me, the fact that there are 50 percent of the sexually explicit websites are foreign and growing. Well, again, Your Honor, that's a finding that, you know, we disagree with 50 percent. We think, you know, that the bulk of the problem is, in fact, domestic. But even assuming, even taking that factual finding as the district court made it, there is no case, no decision has ever held to our knowledge, and ACLU certainly hasn't cited anything, that the inability or the failure of Congress to address, you know, a problem with an international dimension, you know, because they can only apply it to a domestic source makes a statute fatally under-inclusive. It's just not the law. I mean, the law is precisely the opposite under Mariani and McConnell. It's quite clear that Congress can act incrementally to address a problem. This is a first step. And it's a first step that has been cut off at the knees because the statute has been enjoined for 10 years now. But the point is, with regard to the filters, you're saying 50 percent non-use. But let's assume, well, there's a couple of responses to that. Isn't that a decision of the parents to get a filter or not get a filter, number one? I was thinking you were going to go on. No, that's okay. It is certainly a decision of the parents. And COPA doesn't seek to substitute its judgment. That's what you're going to hear from the ACLU. COPA is an effort to substitute Congress's judgment for that of parents. I mean, again, harking back to the material at 880 to 920, there's a pretty solid consensus that that is material that you don't want your children to see. And number two, if you leave it with the parents or you leave it with filters, that doesn't run afoul of the First Amendment or doesn't give you the concerns that your opponents have with regard to the First Amendment. But, again, the filters are not perfect. The material that we're citing to you with that joint appendix, that's material that's missed by three to four filters. Even by the district court's own findings, there's a 5 percent underblocking rate, which is when you talk about the vast volume of material, that's a significant thing. There are ways to circumvent filters. That was in the record here. It's not disputed. The district court said, well, some of these ways may or may not work. But then when the district court was looking at age verification. But, in effect, what they're saying is if there is nothing that works perfectly here, why not go with the thing that least offends the Constitution? Well, again, Your Honor. Assuming that it offends the Constitution. COPA is not an effort to say don't use filters. This is a belt and suspenders approach. COPA encourages the use of filters, has since its inception. All that COPA recognizes, and age verification requirements recognize, is that there continues to be a problem. And this record abundantly supports the notion that there continues to be a problem, even with filters, given the existing non-use of filters by parents. And let me address Your Honor's point because I think I missed a little bit of that. As far as the non-use reflecting parental decisions on, you know, whether this is a significant problem, ACLU will say, well, they think that it's not really that much of a problem. The record indicates, in particular at JA 1561, the parents that turned off their AOL, stopped their AOL filtering, they did so because they thought it was too restrictive. Seventy-two percent of parents who did that, they thought it was too restrictive. So there's reason to believe that, you know, part of the reason for the non-use of filtering is problems with filtering. These are problems that are not going to go away. There's an absolute correlation between under-blocking and over-blocking. In other words, the better the filter works at blocking the sexually explicit material, the more material it over-blocks. The district court found that, well, the surveys by the government, you know, may have exaggerated the over-blocking, but they did not in any way dispute that there was a correlation between those two things. And it's just inherent in the technology. The better, sort of the more specific you are in blocking the sexually explicit, the more you're going to sweep in extra materials. That has First Amendment costs, too. And, again, the question is whether the First Amendment disables Congress from addressing the problem at the source as an additional component to filtering. And that's why this really doesn't fall into sort of a traditional, less restrictive alternative sort of analysis. For instance, in the Playboy case that the Supreme Court dealt with, the targeted blocking there to address the problem of signal bleed that was at issue in that case, there was a perfect solution to the problem. The parents could request a targeted block that would solve the problem. So there, less restrictive analysis really does sort of make sense. There's something else that Congress could do and make available that will solve the problem. Here, there is no such thing. And what the record on remand has shown is that there isn't a solution to the problem. And the question is whether whatever remains of the problem from 50 percent non-use to, you know, the 5 percent under-blocking rate or whatever percentages you want to talk about, whether Congress can address that problem through age verification. And the assessment of whether that is a permissible thing to do, of course, depends on whether you think COPA is too burdensome, whether age verification is too burdensome. But the court, again, a finding of fact of 667 on less restrictive means, is, quote, filters are less restrictive than COPA, close quote. I understand that, Your Honor, but that's sort of, I mean, that's not really a finding of fact so much as a judgment about, you know, the question that the Supreme Court has remanded for. I mean, that's the case. But a finding of fact at 795 is that filters generally block about 95 percent of sexually explicit material. I understand, Your Honor. And while I want to make clear that we think. I'm not sure what generally means, but that's okay. Well, there are some problems with that, and we think that generally it is actually a little bit lower. But even accepting the findings, the findings are the important thing, the 95 percent. Accepting that finding as true, there's still an under-blocking problem. There's still a significant problem. And the question, as Justice Breyer said, is whether the candle is worth the game given the problem that still remains. And, again, assessing sort of filtering in the abstract and in the aggregate against COPA is not really the proper inquiry. What you're looking for traditionally in less restrictive alternative analysis is you have a problem and you have different ways that Congress could go about addressing that problem. Now, COPA is one way that Congress can and did go about addressing it. Put blind Iraq laws, essentially, onto the Internet. That's what Congress wanted to do. And at the same time, you know, wanted to encourage filtering. And so to say filtering is the less restrictive alternative really doesn't work. It's what Congress could do to bump up the rate of filtering at this point. And that's what the Supreme Court remanded on. And, again, the district court didn't really address that fundamental issue, didn't address the fact that there's a 50 percent non-use rate of filtering, much less sort of the reasons for that. And what we suggested is the reasons for that are something, a problem that's inherent in filtering in that it overblocks. It sweeps in extra materials. Filters require maintenance. They require parents to do things. They may be easier than they were in the past, but they still, in some instances, cost money. They're not entirely cost free. And so you have a 50 percent non-use rate. What about the finding that filters are widely available, easy to maintain, hard for children to circumvent, and can be installed on computers or wireless devices? Again, Your Honor, the question is what to make of that finding for purposes of First Amendment analysis. Widely available and easy to use are pretty qualitative findings. And, you know, we are, again, not challenging the 95 percent, you know, rate of effective screening. That's a finding that, you know, can sit out there. We're saying there's still a problem even given that. Unless the Court has additional questions, I think I might be better served by sitting down now and saving for rebuttal. Thank you very much. Thank you, Your Honor. Mr. Hanson. Good afternoon, Your Honors. Excuse me. My name is Christopher Hanson. I represent the plaintiffs' FLEs here. If you might just start where we started with your opposing counsel on the law of the case issue. Yes, Your Honor. Our view on the law of the cases is, as our letter suggests, that to the extent the prior panel made purely legal judgments, and they did in several instances, then this panel is bound by those purely legal judgments. But there they made those in connection with a preliminary injunction, did they not? Unquestionably, yes. How do I get around Pitt News? Well, I don't think Pitt News presents a problem here. As I read Pitt News, if the judgment is a purely legal judgment, independent of the likelihood of success standard, then you are bound by the prior panel. If the legal judgment is somehow bound up in the likelihood of success, then I think you are not bound by it. Here we have a number of judgments by the first panel, defining, for example, the language as a whole, or defining the language of minors, that are independent of any facts and independent of the likelihood of success standard. Those are simply pure legal interpretations of the meaning of the words of the statute. Given that they are independent of facts and independent of the likelihood of success standard, I think you are bound by those judgments. Would you prefer that we decide this case, assuming we were to go your way, on law of the case, or would you prefer that we deal with it based on the decision of the district court making findings of fact in connection with, in effect, what the Supreme Court has already said in our court? Assuming you are going to go my way, I'd prefer a belt and suspenders. I'd prefer you give us victory on both grounds. If you do the first, you don't get to the second. I think the court is obligated to wrestle with the filtering issue that the Supreme Court remanded, even if the legal judgments of the first panel would be by themselves sufficient to justify judgment for the plaintiffs. The Supreme Court clearly was very interested in the comparative effectiveness of COPA versus filters, and it remanded for precise findings on that subject. The district court spent an enormous amount of time and effort making judgments on precisely that question, and I think this court also ought to look at that question. How do you view how the Supreme Court treated our opinion? Your adversary seems to think that all bets are off. Is that your position as well? No, it's not. I agree with his description of what the Supreme Court did. The Supreme Court did not reach a lot of the legal issues that the panel reached in this case. But I don't think that means that the Supreme Court reversed on that, and I don't think it means the Supreme Court suggested the panel was wrong on those. I think it just suggested that the issue that most intrigued them was the filtering issue, and they remanded for further factual findings on the filtering issue, which then Judge Reed did. But what I think is critical to start out sort of framing this case is that COPA is a statute that criminalizes speech on the basis of its content. There are four really basic First Amendment principles that flow from that observation. First, the statute is presumed unconstitutional. Second, the government must show a compelling interest in order to establish the need for the statute. Third, the government has the burden of showing that there are no less restrictive alternatives. And fourth, the government has the burden of proving that the statute is unconstitutional. You don't have a problem on the second one, do you? The Supreme Court has said on a vast number of occasions that there is a compelling governmental interest in protecting minors from having access to material like this. However, the government in this case appears to be arguing that the government has a compelling interest in overriding parental decision making. So they make much of the 50% of the parents who don't use filters. Now, Playboy says we should not presume that the 50% of the parents who don't use filters are doing it because they're irresponsible or inattentive. We should presume that they have made a conscious judgment that this is not appropriate. And if that's right, then I think the government does not have a compelling interest. I think that we should presume that the 50% of the parents who don't use filters have made a conscious judgment that they don't need filters in their home, either because they trust their children, which is, in fact, the major reason parents give for not using filters, or alternatively because they have taken other steps to protect their children on the Internet. The evidence in this case shows that 85% of all parents are taking some steps to protect their children in the home. And there are other things you can do besides filtering. The most common one is to put the computer in the living room. You put the computer in the living room. If your kids are online and going to find things that you don't want them to see, your kids also know that you could walk through the room at any moment. It is an extraordinarily effective deterrent effect in having your children go out and look for things that you don't want them to look for. Other parents utilize other devices, such as education, explaining to their children how to conduct searches, so that you only get what you want to get, you don't get things you don't want to get, and explaining what the rules of the house are. In our household, we don't go to those kinds of sites. What the studies in this case show, the COPA Commission report and the NRC report, show that devices like that can also be effective, either with or without filters, in protecting children from having access to sexually explicit material. How about the household where the parents really approve of the children looking at pornography? And that may come as a surprise to you, but there are some people that really think, well, the kids ought to grow up. And I think that goes precisely to the point I was trying to make a moment ago, which is the government, we think, does not have a compelling interest in overriding that parental judgment. Really? So that suppose, for example, the 50%. A child smoking marijuana, does the government have a compelling interest? And the parent knows it. They say, well, I like marijuana, maybe the kid will too. No, I think the biggest difference, I think, in between the two is that this is speech and that isn't speech. But this precise issue is, the Supreme Court's wrestled with this precise issue twice recently. In Reno versus ACLU, one of the reasons the Supreme Court struck down the statute was because it would prohibit a parent from showing the material to the child, even if the parent wanted to. The Supreme Court struck down Playboy in part for the same reason. So I agree there is a compelling governmental interest here. I don't agree that that compelling government interest reaches overriding parental decision-making. Well, it seems your adversary has suggested, sure, filters are fine, they're effective, and they serve the compelling interest. But I think they're also arguing, hey, you know what, maybe COPA can coexist, and we're all rowing in the same direction. Can't both coexist? Well, there's no question that both can coexist. The question is whether the First Amendment permits both to coexist. And, again, to belabor the belt and suspenders metaphor, if the belt works at least as well as the suspenders, then the First Amendment prohibits you from sending people to jail for not wearing their suspenders. The First Amendment says you have to use the most narrowly tailored method, and you can't just keep piling methods on over and over again. And let's talk about effectiveness here, because what the government doesn't tell you, it didn't tell you at oral argument, is how incredibly ineffective COPA will be. The most basic way in which COPA will be ineffective is it won't reach overseas sites. The evidence in this record from both the plaintiffs and the defendants was that approximately 50 percent of all of the sites that the government says are covered by COPA are hosted or registered overseas. Those won't be affected by COPA one iota. And now let's think about what that actually means in practical terms. So suppose I'm a minor and I go onto my computer and I type in the word sexually explicit. What's going to come up on my computer is all of the, if I do that in Google, what's going to come up on my computer is all the overseas sites that are sexually explicit. Even if COPA is in effect, the first 10 or 15 things that Google returns to me are going to be sexually explicit sites. COPA will have absolutely no effect on those. And it will be literally just as easy for a minor, after COPA goes into effect, as it is for a minor today taking access to sexually explicit speech. So not only is COPA a criminal statute applied to speech, but it is a grossly ineffective criminal statute. That's not the only problem with COPA. COPA also applies only to the web. It doesn't apply to other forms of Internet speech. The most dramatic version of that is it doesn't apply to streaming video. In other words, COPA will not have any effect on the ability of minors to look at video, sexually explicit videos. They are transmitted by a technique that is other than the technique used on the web. So it seems fairly commonsensical that the primary concern that most parents, I think most parents would be more troubled about their children having access to sexually explicit video than sexually explicit text. And yet COPA doesn't even address that question. It doesn't cover email. It doesn't cover news groups. It doesn't cover the interactive kind of sites that are the most popular now among teenagers. Not only does it not cover YouTube, where we find videos, but it also doesn't cover the kinds of interactive sites that teenagers seem to be using so much these days. It only covers the web. So it doesn't cover overseas sites. It doesn't cover non-web based Internet protocols. COPA is going to be wildly ineffectual. Now let's compare that with filtering. We're in apparently relatively complete agreement that filtering is going to be 95% effective. It's going to reach overseas sites. It's going to reach protocols other than the web protocols. It's going to be 95% effective on the entire Internet. That's not belt and suspenders. That's the best belt ever built versus lousy suspenders. That's an indication that it is a more effective tool, not a less effective tool, and it's almost definitionally less restrictive because it's not a criminal statute. Almost by definition, a statute that criminalizes speech is among the most restrictive you can possibly have. This is a statute that criminalizes speech, and therefore it is substantially more restrictive than filtering would be. I think it might be useful, if I could just get a drink, for me to talk a little bit about the commercial purposes argument. Because the government makes much in its brief of the way in which the commercial purposes part of this statute restricts the applicability of the statute. In the first instance, the first panel dealt with this issue and found that it did not restrict the speech at all, and that conclusion is almost inescapable if you look closely at the language of the statute. The statute says it criminalizes any speech that is made by a person who is engaged in commerce. So even if the person has just one page on a very, very large website, by the precise language of the statute, that's covered by COPA. It also says specifically that the speech must not be, the harmful to the mind of speech must not be the predominant, need not be the predominant part of the person's business. So the statute itself expressly says that even if, that you don't have to have a majority of harmful to minor speech, we want to reach even limited amount of harmful to minor speech on your website. And then finally, the statute says that commercial purposes includes advertising. So the government wants to leave the view that this statute only reaches commercial pornographers. Now, that's not a legal term. I don't know exactly what it means. The reason the Supreme Court has developed their definition of obscenity is because the term commercial pornographer doesn't make any sense and no one can define it. That's why we have definitions like obscenity. But even if assuming it had meaning, what it probably means is someone who sells material that is harmful to minors or obscene. Well, this statute explicitly is not limited to sellers. It includes anyone on the web who engages in any speech with a goal of making a profit, whether that profit is from sale or whether it's from advertising or some other mechanism. All of my clients try to make a profit on the web. None of my clients are people you would traditionally consider commercial pornographers. And the judge specifically found, looking at the speech that they are engaged in, that they are at risk of prosecution under this statute. So the commercial purposes language that the government cites simply does not significantly restrict the scope of this statute. The statute is, in fact, wildly broad and wildly extensive. And, in fact, even if you accept that the statute reaches only whatever commercial pornography is, the government spent a million dollars on a study to determine the effectiveness of filters. In the trial court, they apparently thought that the crucial question was how effective filters are. Once their experts showed that filters were 95 percent effective, they're trying to shift the argument in this court. But at trial, they spent a million dollars on a study of the effectiveness of filters. Is there any – let's assume we agree with you. Is there any federal statute at all that one could come out with that would pass constitutional muster? I don't know the answer to that, Your Honor. It is – certainly there are federal statutes that would be substantially less overbroad and substantially less intrusive into the First Amendment. Well, Congress tried with the CDA and Reno said no. And then Congress tried again with COPA. Right. But isn't there something they can do to deal with this compelling interest of protecting minors from pornography? The most obvious example, I think, is probably the increased encouragement of parents and education of parents as to the availability of filters and other techniques like putting the computer in the living room. The government could fund a significant education program to explain to that – to the parents who don't already know, and I think most already do, but to explain to parents what their options are. The government has already mandated that Internet service providers advise parents of the existence of filtering. But they could do more encouragement. They could also develop their own lists of websites that they think are harmful and advertise those to parents and tell them about that. They could evaluate filtering products and say to parents, we've evaluated 15 filtering products and here's the best that you should use. I think your argument is it can't look anything like COPA. No, that is precisely my argument. I'm not sure whether there was a criminal statute that could be written that would reach what it is that the government claims they're trying to reach here. I don't know if there is, and I can't write one, at least at this point. No one will actually ask you. I don't think anyone will ask me. No. And if they do, I'm likely to decline the invitation. What we know is that even if you accept the most narrow definition offered by the government, this statute criminalizes something in the vicinity of half a billion to a billion webpages. It requires that those webpages be put behind credit card screens. The district court's factual finding is if that happens, most of that speech will disappear for adults. Adults will be deprived of somewhere between a quarter of a billion and a half a billion webpages to which they are constitutionally entitled. Under Butler v. Michigan, under Reno v. ACLU, and under the structure set by the Supreme Court in its decision in this case, that's constitutionally impermissible under the First Amendment, and for that reason this statute must be struck. I don't have any questions. I have no further questions. All right. Thank you. Judge Andrew, I think you asked the money question. There is no statute in the ACLU's view that would pass constitutional muster, and I don't think that's the view of the Supreme Court. In Reno v. ACLU, the court identified a number of problems with the statute, sent it back to Congress for a second try here. Congress rectified all the problems that the Supreme Court identified in that decision, made a conscientious effort. There's no dispute about any of that. I think one of the points they're making with regards to this particular statute is a host of issues relating to over and under inclusiveness. What percentage were you able to show the district court, does COPA get to of U.S. sites, realizing it doesn't get to foreign sites? What percentage? It would cover all U.S. sites. In terms of its effectiveness, did you have any evidence on its effectiveness? I'm not sure I understand the question. COPA would require, you know, clearly would require domestic sites might have some sort of additional effect on foreign sites to put the pornography behind the screens. But their point is, just to go on to the next point, if a filter can do 95% of all sites, foreign and domestic, if so facto that's significantly more effectiveness than what COPA would do with respect to the U.S. sites. If a filter is on a computer, Your Honor, and the undisputed evidence here is that 50% of computers are not covered. And I wanted to feed this into a point. But what about his, no, go ahead. You answer that and then I'll go to that. Okay. Judge Greenberg, you asked the question about the household, the hypothetical household where pornography is okay. And the point is, ACO stands up here and says COPA is trying to substitute, you know, Congress's judgment about what's okay. Not true. If you have a house where there aren't filters, whether it's because pornography is okay or because the parents just don't have time to install the filters or supervise their children or whatever of these, you know, glorious empowerment tools the ACLU talks about all the time, you have kids who are potentially susceptible to the pornography. When I put the filters on my computer, they go over and play at the other kid's house, they are exposed to the pornography. And the point is that is a serious problem given the 50% non-use rate. Again, I mentioned this before, but I want to give you a couple of quotes from the COPA Commission report and the NRC report cautioning that the expectations for parental supervision and user end control should not be unrealistic. That's at J1538. That's the NRC report. And the COPA Commission, in a similar vein, says filters provide an important but incomplete measure of protection from harmful to minors material online. The point is, you know, they mock the belt and suspenders approach, but there is a significant child protection problem still out there. And the record evidence, you know, conclusively demonstrates that on remand. It answers the question Justice Breyer was asking, is the candle worth the game? The question then becomes, well, is COPA unduly burdensome? And our answer to that is it's essentially a blind Iraq statute that is being applied to the Internet context. And when properly construed to apply primarily to commercial pornographers, big entities that already accept credit cards as an age verification method for getting to the harmful to minors, for getting to the pornography, it is not unduly burdensome. And properly construed giving actual meaning to the serious value component, as the district court failed to do and the prior panel failed to do, construing it to exclude any material that has serious value for a legitimate minority of older minors. If you do those things, COPA does not impose any serious speech restriction. And to the extent it imposes a serious speech restriction, it's on material that is very close, you know, borderline obscene material, and as Justice Breyer said, very little more. Unless the court has any further questions, I'm happy to sit down. Thank you. I want to thank you and Mr. Hanson both for extremely well presented arguments.  Thank you, Your Honor. Thank you, Your Honor.